IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DUANE L. GADBERRY,          )
                             )
             Plaintiff,      )    Civil Case No. 06-970-KI
                             )
     vs.                 )    OPINION AND ORDER
                             )
MICHAEL J. ASTRUE[1], Commissioner   )
of Social Security,            )
                             )
            Defendant.     )
                             )

Richard F. McGinty
McGinty & Belcher
P. O. Box 12806
Salem, Oregon 97301

Attorney for Plaintiff

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda S. McMahon as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon  97204-2902

Nancy A. Mishalanie
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Duane L. Gadberry brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and remand for further proceedings.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments,

the claimant is conclusively presumed to be disabled. If the impairment is not one that is

presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the

impairment prevents the claimant from performing work which the claimant performed in the

past. If the claimant is able to perform work which he or she performed in the past, a finding of

"not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and

416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner

proceeds to the fifth and final step to determine if the claimant can perform other work in the

national economy in light of his or her age, education, and work experience. The burden shifts to

the Commissioner to show what gainful work activities are within the claimant's capabilities.

Bustamante, 262 F.3d at 954. The claimant is entitled to disability benefits only if he is not able

to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences

reasonably drawn from the record, and if evidence exists to support more than one rational

interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d

1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found that Gadberry had severe limitations of a mild degenerative disc disease of the cervical spine, a history of bilateral carpal tunnel syndrome with bilateral release, and lateral epicondylitis[2] as well as possible fibromyalgia with no objective evidence of such and no control point testing to rule out malingering.  However, the ALJ also found that these impairments, either singly or in combination, were not severe enough to meet or medically equal the requirements of any of the impairments listed in Appendix 1, Subpart P of the Social Security Regulations.  The ALJ found that Gadberry's mental impairments are non-severe because they are only mild in nature.  The ALJ discredited the opinions of several physicians and found Gadberry credible only to the extent that he does have impairments that may cause some limitations but is not so limited that he is precluded from all work activities.  The ALJ found that Gadberry had a residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour work day; sit for 6 hours in an 8-hour work day; engage in only occasional overhead reaching; and no significant mental limitations.  Based on vocational testimony, the ALJ concluded that Gadberry could perform several jobs, including small product assembly, cleaner/polisher, inspector of electronics, and surveillance, and thus was not disabled under the Act.

## FACTS

Gadberry claims that he became disabled on October 1, 2002 due to depression, pain, carpal tunnel syndrome, cervical disc disease, and cervical spondylosis.  He was 41 years old at the time of the ALJ's decision, has a GED, and worked primarily as a cable installer, except for a brief stint as a gas station attendant.

---

[2]  Inflammation of the elbow.  Merriam Webster's Medical Desk Dictionary 589 (1996).

Gadberry left his last job stringing cable because he could no longer grip the cable well enough to pull it into position.  His hands are numb and have no strength, causing him to drop things.  Gadberry stated that he continued to have these problems with his hands since the carpal tunnel surgery.  He complained of back pain and the inability to walk more than a block or two without resting for five minutes.  Gadberry's knees cause him pain when he stoops or bends, his neck hurts when he looks up, and he has constant fatigue.  The depression makes it difficult for Gadberry to focus on a task but he agreed at the hearing that the depression had improved since October 2002, his alleged onset date.  Gadberry smokes marijuana on a daily basis to control his pain and was applying for a state medical marijuana card at the time of his hearing.  He has stopped some of his hobbies, such as disc golf and bicycling, due to his symptoms.

Gadberry had carpal tunnel release surgery on both arms in late 1997 and early 1998.  By September 1998, Gadberry reported to Dr. Buehler that the numbness and tingling from the carpal tunnel syndrome had resolved.  By October 12, 1998, Gadberry returned to Dr. Phipps, his treating neurologist, with complaints of weakness in his arms.  In November 6, 2000, Dr. Phipps, re-examined Gadberry a final time for hand complaints of numbness and weakness.  Dr. Phipps found that Gadberry's left median nerve conduction was normal and the right was abnormal but was much improved from presurgical status and was unchanged from a couple of years earlier.  Dr. Phipps thought that continued conservative approaches were reasonable, including neck exercises, and did not think further studies were likely to be of benefit.  He did not state any limitations.

## DISCUSSION

I.    Determination of Impairments

Page 6 - OPINION AND ORDER

Gadberry argues that it is unclear which physical impairments the ALJ considered severe. He also raises an argument about the ALJ failing to find that he has a severe mental impairment. Both of these arguments are another way of challenging the ALJ's decisions on how much weight to give to various physicians' opinions, which I address below.

II.    Gadberry's Subjective Testimony

Gadberry argues that the ALJ improperly discredited his subjective symptom testimony.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must (1) produce objective medical evidence of one or more impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The claimant is not required to produce objective medical evidence of the symptom itself, the severity of the symptom, or the causal relationship between the medically determinable impairment and the symptom. The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. Id. at 1282. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if the ALJ makes specific findings stating clear and convincing reasons for the rejection, including which testimony is not credible and what facts in the record lead to that conclusion. Id. at 1284.

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in

determining the severity of the pain and its disabling effects.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ rejected Gadberry's testimony to the extent that he alleged symptoms which would preclude him from all work activities.  There is no evidence of malingering so the ALJ must make specific findings stating clear and convincing reasons for the rejection.

The ALJ compared Gadberry's testimony at the hearing – that his arms and hands were in pain since his carpal tunnel surgery – with the report from his treating physician that the surgery resolved the symptoms.  Nerve conduction studies post surgery were normal on the left side and much improved on the right side, meaning it is unlikely that his symptoms were unabated.  This inconsistency is supported by the record.  The ALJ noted that there was very little treatment for the alleged back pain, another reason also supported by the record.  The ALJ noted that Gadberry testified at the hearing that his depression was much improved since 2002 but otherwise claims that it is debilitating.  This inconsistency is also supported by the record but I note that Gadberry received treatment for depression and anxiety during a substantial period of time.  His testimony did not make a lot of sense – some follow-up questions may have clarified this point.

The ALJ concluded that Gadberry was vague about his work history, based on Gadberry's confusion about dates and at which hospitals he had done cable installations.  At the hearing, Gadberry readily admitted that he was not good at dates and corrected himself when his attorney referred to the earnings report.  His confusion is especially understandable for events that occurred four years earlier.  Thus, this is not a valid reason for the rejection.

The ALJ compared Gadberry's testimony of significant physical limitations with Dr. Reilly's note in June 2003 that he was quite active and had crashed his mountain bike on

several occasions.  The note, however, does not date the crashes so they could have occurred

prior to the disability onset date.  The ALJ also relied on that note's statement that Reilly had

wrist pain after jumping over a fence.  I agree that the wrist injury was current at the time of the

note and is inconsistent with significant physical limitations.  The ALJ was concerned that

Gadberry testified that he could not afford a medical marijuana card but admitted that he used

marijuana every day and presumably was purchasing the drug.  I also note that Gadberry then

stated that he was in the process of applying for a card, casting further doubt on his statement that

he could not afford to apply.

Finally, the ALJ relied on Dr. Reilly's statement in November 2003, over a year after

Gadberry's alleged onset date, that he was released for full-time work.  This is a valid reason to

doubt Gadberry's testimony.

The fact that the ALJ improperly considered some reasons for finding plaintiff's

credibility undermined does not mean that the ALJ's entire credibility assessment is improper.

Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2003).  When

viewed together, the reasons I determined above to be valid are clear and convincing reasons for

the rejection.  The ALJ committed no error.

III.    Physician Opinions

Gadberry contends that the ALJ erred in rejecting the opinions of several physicians.

The weight given to the opinion of a physician depends on whether the physician is a

treating physician, an examining physician, or a nonexamining physician.  Lester v. Chater, 81

F.3d 821, 830 (9th Cir. 1996).  More weight is given to the opinion of a treating physician

because the person has a greater opportunity to know and observe the patient as an individual.

Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating or examining physician's

opinion is not contradicted by another physician, the ALJ may only reject it for clear and

convincing reasons.  Even if it is contradicted by another physician, the ALJ may not reject the

opinion without providing specific and legitimate reasons supported by substantial evidence in

the record.  Lester, 81 F.3d at 830.  The opinion of a nonexamining physician, by itself, is

insufficient to constitute substantial evidence to reject the opinion of a treating or examining

physician.  Id. at 831.  Opinions of a nonexamining, testifying medical advisor may serve as

substantial evidence when they are supported by and are consistent with other evidence in the

record.  Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600 (9th Cir.

1999).

Credibility determinations bear on the evaluation of medical evidence when there are

conflicting medical opinions or inconsistency between a claimant's subjective complaints and his

diagnosed conditions.  Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005).

A.    Dr. Banks

Gadberry argues that the ALJ improperly rejected the fibromyalgia diagnosis from his

treating neurologist, Dr. Banks.  According to Gadberry, the ALJ is not a medical source and is

not competent to determine proper medical procedure.

Dr. Banks first saw Gadberry on January 24, 2005 and diagnosed him with a rare case of

male fibromyalgia.  Gadberry returned on February 15, 2005 and May 19, 2005, with no change

in his condition and only partial compliance with the doctor's suggestions.  There is no chart note

for the May 19 visit but it is described in an opinion letter dated June 22, 2005.  In that letter,

Dr. Banks explained that Gadberry had painful trigger points in the neck and elbow.  In response

to a letter from Gadberry's attorney, Dr. Banks answered affirmatively on July 26, 2005 by checking a box that Gadberry meets the American College of Rheumatology diagnostic criteria for fibromyalgia. There is no chart note detailing which trigger points were painful and which were not.

The ALJ stated that Dr. Banks failed to conduct any fibromyalgia examination other than to state that Gadberry had tender points in the neck and elbow, two areas which are implicated by Gadberry's degenerative disc disease and epicondylitis, diagnosed as causing his elbow pain on November 11, 2004. The ALJ noted problems with Dr. Banks' opinion because of this overlap in tender areas and the failure to mention testing of any control trigger points.

I first note that Dr. Banks did not put any limitations on Gadberry due to fibromyalgia. I also note that the ALJ's residual functional capacity is based on the physical impairments, one of which was found to be possible fibromyalgia, and the "resulting fatigue and pain they allegedly cause." Tr. 18. Without limitations, the fibromyalgia diagnosis is of limited use to Gadberry in determining his capabilities. Nevertheless, I agree with the ALJ that Dr. Banks' diagnosis is not corroborated by any chart notes indicating which trigger and control points were tested and which produced pain. I also agree that the overlap of the painful trigger points with Gadberry's other known physical impairments is troubling, particularly in light of the lack of documentation of the testing methodology. Dr. Reilly specifically contradicted Dr. Banks by stating that Gadberry did not have fibromyalgia. Thus, the ALJ can only reject Dr. Banks' opinion by giving specific and legitimate reasons supported by substantial evidence in the record. The ALJ has done so and consequently, he has properly rejected Dr. Banks' opinion.

B.    Dr. Reilly

Gadberry contends that the ALJ improperly rejected the opinion of his treating physician,

Dr. Reilly.  Gadberry argues that the ALJ is not competent to conclude that Dr. Reilly must

perform psychological testing to diagnose psychological conditions.

Dr. Reilly, an osteopath, treated Gadberry from June 12, 2003 through a last examination

on May 7, 2004 and medication refills through January 19, 2005.  In a letter dated August 23,

2005, Dr. Banks stated that he was treating Gadberry for cervical disk disease, carpal tunnel

syndrome, depression, and anxiety.  Gadberry also had subjective complaints of paresthesias[3] in

his hands and intermittent headaches.  Dr. Reilly stated that he had not diagnosed fibromyalgia.

He also found no objective findings to justify the paresthesias or chronic recurring pain in the

upper extremities, in spite of a neurological consultation and multiple MRI studies.  Dr. Reilly

also stated in the letter:

> It has been medically challenging to associate Mr. Gadberry's subjective
> findings with objective findings on physical exam including imagery and nerve
> conduction studies.  His persistence of musculoskeletal and neurologic complaints
> have significantly impaired his ability to engage in gainful employment.  His skill
> was in electrical occupations, and certainly the extending of his neck and working
> with his arms uplifted have compounded these symptoms, and it would be prudent
> for him to avoid any of these repetitive activities.  Additionally, the patient's
> depression and anxiety do integrate with the above other medical conditions and
> compromise his ability to engage in sustained or competitive work activities.
>
> Mr. Gadberry's excessive fatigue, I believe, is related to his depressive
> disorder.  I do not believe that he is malingering in his efforts to return to work.  I
> incorporate the psychological aspects of this person's medical condition to be

---

[3]  "[A] sensation of pricking, tingling, or creeping on the skin having no objective cause
and usually associated with injury or irritation of a sensory nerve or nerve root."  Merriam
Webster's Medical Desk Dictionary 589 (1996).

> equally as valued as the musculoskeletal conditions that he is affected by. Certainly his depression in conjunction with a degenerative arthritis is producing significant reduction in the patient's outcomes and ability to be gainfully employed.

Tr. 181-82.

Dr. Reilly also completed Mental and Physical Residual Function Capacity Reports for Gadberry on February 6, 2004 in which he rated Gadberry as having several moderate mental limitations and numerous physical limitations, but did not opine that Gadberry was unable to work.

Dr. Reilly responded to a series of letters from the state's Office of Vocational Rehabilitation. In November 2003, Dr. Reilly stated that he had not ordered work stoppage and that Gadberry was released to full-time work. On December 2, 2003, the doctor stated that he had not assessed Gadberry's ability to work. On February 4, 2004, Dr. Reilly stated that carpal tunnel syndrome does not contribute to Gadberry's limitations.

The ALJ gave little weight to Dr. Reilly's August 23, 2005 opinion letter because the opinion was based on Gadberry's subjective complaints, was not supported by Dr. Reilly's or other doctors' medical records, and was not supported by Dr. Reilly's February 2004 assessment that Gadberry could work with limitations. Additionally, the ALJ noted that the opinion letter, written 15 months after Dr. Reilly last treated Gadberry, noted the doctor's difficulty in associating Gadberry's subjective complaints with objective findings. The ALJ also observed that Dr. Reilly failed to conduct any objective psychological testing to confirm Gadberry's psychological complaints.

Page 13 - OPINION AND ORDER

The gap in time between Dr. Reilly's last examination of Gadberry on May 7, 2004 and the opinion letter of August 23, 2005 is significant, particularly when Dr. Reilly treated Gadberry for just under a year.  It is also significant that Dr. Reilly was forthright in admitting that it was challenging to associate subjective and objective findings, even with extensive testing.  A physician's opinion of disability "premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted."  Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 602 (9th Cir. 1999) (internal quotation omitted); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  Gadberry's credibility was properly discounted.  In sum, the ALJ gave clear and convincing reasons for the rejection of Dr. Reilly's opinion.

C.    Dr. Greenough

Gadberry contends that the ALJ improperly rejected the opinion of the examining psychologist, Dr. Greenough, because he did not perform objective psychological testing and considered the effect of Gadberry's drug use prior to finding him disabled.  Gadberry further contends the ALJ erred by giving controlling weight to the state agency psychologist, Dr. Anderson, who concluded on April 28, 2004, that the mental impairments were not severe.  Gadberry argues that as a nonexamining physician, Dr. Anderson's opinion is not considered substantial evidence.  Gadberry also notes that several exhibits were added to the record after Dr. Anderson's review.

Dr. Greenough performed a neuropsychological evaluation of Gadberry on January 21, 2004, at the request of Vocational Rehabilitation.  He administered the Wechsler Abbreviated Scale of Intelligence, Wide Range Achievement Test-3, Bender Motor/Visual Gestalt Test with

Memory, Logical Memory I of Wechsler Memory Scales-III, Trailmaking and Verbal Fluency

Sub Tests of the Delis-Kaplan Executive Function Scales, Reitan Indiana Aphasia Screening

Test, Sentence Repetition Test, Reading Comprehension Section of the Wechsler Individual

Achievement Test-II, as well as a clinical interview.  Dr. Greenough concluded that Gadberry

had a mixed expressive receptive language processing disorder affecting primarily expressive and

receptive written language but also oral language to a lesser degree; depression not otherwise

specified, related to chronic pain and physical disability but of a fairly chronic nature at the time;

anxiety disorder not otherwise specified, with some history suggesting possible panic disorder;

and cannabis abuse.  The doctor observed Gadberry to be anxious, restless, and disorganized, as

demonstrated by arriving two hours late due to problems obtaining a ride.  Gadberry's depression

symptoms were less obvious but clearly present.  He would need hands-on training rather than

normal academic training, even with accommodations.  Jobs minimizing reading and writing

requirements were needed due to the language processing disorder, even though Gadberry was in

the low average range of intellectual ability.  Dr. Greenough assessed a Global Assessment of

Functioning score of 46, indicating serious symptoms.

> From my perspective, the kinds of jobs on which the client would do best
> are those which require eye-hand coordination, the ability to work fairly quickly
> on physical tasks which are cognitively fairly simple in nature, or at least which
> are spatially mediated.  Unfortunately those are the very kinds of things the client
> says he is unable to do because of his described physical problems.  If medical
> evaluation confirms the disability in hand and arm use, then the client may need to
> pursue the option of Social Security disability.
>
> It is my impression, however, that Mr. Gadberry would much rather be
> working.

Tr. 161.

Page 15 - OPINION AND ORDER

The ALJ gave little weight to Dr. Greenough's assessment because:

> he fails to administer any objective testing to determine if the claimant is malingering or exaggerating his symptoms, such as the MMPI-2 or the TOMM. The claimant's allegations do not appear anywhere else in the records and only appear during this evaluation. There is no mention of any anxiety or panic attacks, no mention of any type of learning disorder, and no evidence of any treatment or medication for emotional problems in the records prior to this evaluation. Where there is some mention of depression in the records prior to this evaluation, such does not appear to have been a significant problem. Moreover, Dr. Greenough fails to delineate just what effect the claimant's cannabis abuse has on his mental functioning or emotional stability.

Tr. 15-A.

Because Dr. Anderson contradicted Dr. Greenough, the ALJ can only reject Dr. Greenough's opinion by providing specific and legitimate reasons supported by substantial evidence in the record.

I am unpersuaded by Gadberry's contention that the opinion of the nonexamining physician, Dr. Anderson, is not substantial evidence on which to base a rejection of another physician's opinion. See Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1996) (opinion of nonexamining physician, *by itself*, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician). That statement of law does not apply here because the ALJ relied on other factors in addition to Dr. Anderson's opinion.

The Commissioner cites Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 205), for the statement that a psychological opinion is properly rejected if it is not supported by clinical evidence and based on the person's subjective complaints and information from family and friends. Dr. Greenough's opinion, however, is supported by eight objective psychological tests. Although the MMPI-2 is commonly administered in these situations, its use is not mandated.

Page 16 - OPINION AND ORDER

The ALJ stated that Gadberry's allegations on which Dr. Greenough relied do not appear elsewhere in the record. Gadberry only mentioned anxiety or panic attacks during the interview when he told the doctor that he had taken antidepressants in the past "for anxiety attacks or something." Tr. 158. His statement is confirmed by the medical record. Dr. Reilly treated Gadberry with different antidepressants from June 2003 through November 2004. Moreover, after Dr. Greenough's examination, Gadberry was trying various antidepressants and related prescription drugs when he was treated at the McMinnville First Medical Clinic from November 2004 through September 2005 to alleviate his depression, anxiety, and panic attacks. Tr. 166-73. Thus, the ALJ's statement that depression was not a significant problem is not supported by the record.

The ALJ correctly noted that there is no mention elsewhere in the record of the learning disorder, referred to by Dr. Greenough as a "mixed expressive receptive language processing disorder affecting primarily expressive and receptive written language but also oral language to a lesser degree." Tr. 161. As Dr. Greenough noted, however, Gadberry worked his entire career as a cable installer, a job requiring eye-hand coordination and quick work on physical tasks which are cognitively fairly simple. His work experience did not implicate his language processing disorder, making it reasonable that he was never diagnosed. I also note that Gadberry obtained a GED instead of a high school diploma, another possible indicator of a learning disorder. Accordingly, I do not consider the lack of prior diagnosis to be a legitimate reason to reject Dr. Greenough's opinion.

The ALJ's final reason for rejecting Dr. Greenough's opinion was that he failed to delineate the effect of cannabis abuse on mental functioning or emotional stability. The

Page 17 - OPINION AND ORDER

regulations require a finding of disability as a condition precedent to a determination of whether

drug addiction or alcoholism is a contributing factor.  20 C.F.R. §§ 404.1535(a), 416.935(a);

Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001).  Here, the ALJ only referred to

Gadberry's drug use in deciding whether to reject a doctor's opinion.  That is a permissible

reference, but not a very persuasive one.  If the ALJ sought more information on a topic that was

not addressed in the doctor's report, he could have recontacted the doctor.  It does not logically

follow that the opinion on the addressed topics is not supportable.

        None of the ALJ's reasons for rejecting Dr. Greenough's opinion are specific and

legitimate reasons supported by substantial evidence in the record.  Thus, the rejection was not

permissible.

IV.    Lay Testimony

        Gadberry contends that the ALJ erred by failing to evaluate the written testimony of his

mother, Emma Sherwood, given in a Function Report Adult – Third Party.  Gadberry also

complains that the ALJ adopted portions of Sherwood's opinion without giving consideration to

parts of her opinion that support a finding of disability.

        Lay testimony about a claimant's symptoms is competent evidence which the ALJ must

take into account unless he gives reasons for the rejection that are germane to each witness.  A

medical diagnosis, however, is beyond the competence of lay witnesses.  Nguyen v. Chater, 100

F.3d 1462, 1467 (9th Cir. 1996).  A legitimate reason to discount lay testimony is that it conflicts

with medical evidence.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

        Gadberry lived with Sherwood when she completed the report on March 15, 2004.

Sherwood reported that Gadberry did the dishes, cared for the household's dog and cat, cared for

his own grooming, and fixed a simple lunch for himself.  He could do cleaning, laundry, and minor repairs such as small paint jobs or changing light bulbs.  Gadberry went out to walk, drive, or bike two or three times a day and shopped once a week for food.  He visited with friends in person or on the phone three or four times a week.  Gadberry woke every one to two hours during the night due to neck and leg pain.  Sherwood reported that Gadberry could only stand for 30 to 60 minutes at a time, could only do chores in short intervals of 30 to 45 minutes, could not do yard work, could only walk one block, dropped things due to a poor grip, and had memory problems due to pain and depression.  Gadberry had stopped playing disc golf and fishing due to his illness.

The ALJ stated that he found Sherwood's report to be "generally credible in that she is simply reporting her observations of the behaviors the claimant demonstrates." Tr. 18.  The ALJ then goes on to paraphrase Sherwood's report.  I agree, however, that the ALJ only recites the information from Sherwood which demonstrates what Gadberry is capable of, but ignores Sherwood's report of limitations she observed in Gadberry.  The ALJ concludes, "While these witnessed activities do not necessarily translate into an ability to engage in and sustain work activities, they do indicate the claimant is not as limited as he alleges." Id.

The ALJ's failure to comment on Sherwood's report of Gadberry's limitations does not provide a balanced analysis of her information and is a rejection of part of her testimony without giving germane reasons.

V.    Vocational Testimony

Gadberry contends that the ALJ erred by relying on the vocational expert's testimony concerning the number of available jobs.  According to Gadberry, the vocational expert failed to

correlate the job information based on the Oregon Labor Market Information System cluster groups with the Dictionary of Occupational Titles ("DOT") codes she was using. Gadberry is also concerned about the large number of DOT codes selected by the expert and her translation to a number of jobs in the subset selected.

Some of the testimony on this issue follows:

Q.      In regard to the cleaner polisher, can you give us any of the available jobs regionally or nationally directly related to any of the DOT numbers that you've given?

A.      Yes, I think I gave those numbers.

Q.      Well, I have four different DOT numbers here.

Q.      Right.  I have various DOT codes in the cluster group.  I gave you several of them.  But in terms of breaking it down to, you know, buckle class or cartridges, no, I can't go that fine.

Tr. 275.

I agree with Gadberry that the vocational expert was not sufficiently clear on how her job numbers related to the DOT codes she provided to the ALJ.

VI.     Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited.  Id.  If this test is satisfied, remand for payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting the

Page 20 - OPINION AND ORDER

evidence.  Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000), cert. denied, 531 U.S. 1038

(2000).

The "crediting as true" doctrine resulting in an award of benefits is not mandatory in the

Ninth Circuit, however.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).  The court has

the flexibility to remand to allow the ALJ to make further determinations, including

reconsidering the credibility of the claimant.  Id.  On the other hand, "in the unusual case in

which it is clear from the record that the claimant is unable to perform gainful employment in the

national economy, even though the vocational expert did not address the precise work limitations

established by the improperly discredited testimony, remand for an immediate award of benefits

is appropriate."  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004).

Even crediting Dr. Greenough's report as true does not answer the question of whether

the mental limitations stated in the report make Gadberry disabled or whether jobs exist which he

could perform.  Consequently, I will remand the action for further proceeding as discussed in this

opinion, including crediting Dr. Greenough's opinion, finding that Gadberry has a severe mental

impairment, incorporating Dr. Greenough's limitations into the residual functional capacity,

reevaluating Sherwood's lay testimony in its entirety, and obtaining new vocational expert

testimony with more attention paid to the job numbers presented by the expert.  The ALJ may

address other issues as necessary due to the time lapse since the last opinion.


///


///

Page 21 - OPINION AND ORDER

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

Dated this ____26th_____ day of April, 2007.


                                    ___/s/ Garr M. King_____
                                    Garr M. King
                                    United States District Judge